**Exhibit A**

**The Final Award of JAMS Arbitrator Michael H. Dolinger**
**In the matter of YClean Enterprices, LLC and Conseal International Inc.**

**JAMS Case No. 1425036426**

JAMS ARBITRATION
No. 1425036426

**YCLEAN ENTERPRISES, LLC,**

  **Claimant,**

  and

**CONSEAL INTERNATIONAL INC.,**

  **Respondent.**

---

AMENDED FINAL AWARD

1. <u>Parties</u>: YClean Enterprises LLC  (Claimant)

   ConSeal International Inc. (Respondent)

2. <u>Attorneys</u>: Philip D. Neuer, Esq. (Claimant)
   Neuer Law LLC
   1875 McCarter Highway
   Newark, New Jersey 07104
   Tel.: 973-482-0840
   Email: pdn@neuerlaw.com

   Joshua D. Martin, Esq. (Respondent)
   Johnson & Martin PA
   500 West Cypress Creek Road
   Suite 430
   Fort Lauderdale, Florida 33309
   Tel.: 954-790-6699
   Email: josh.martin@johnsonmartinlaw.com

3. <u>Arbitrator</u>: Michael H. Dolinger
   JAMS
   620 Eighth Avenue
   16th/34th Floors
   New York, New York 10018

4. <u>Case Manager</u>     Catrina Barnes
<u>& Case Coordinator</u>:  Cathleya Fajardo
                       JAMS
                       620 Eighth Avenue
                       16th/34th Floors
                       New York, New York 10018
                       Tel.: 212-607-2785
                                212-607-2756
                       Email: cbarnes@jamsadr.com
                               cfajardo@jamsadr.com

5. Claimant YClean Enterprises ("YClean") commenced this arbitral proceeding against ConSeal International Inc. ("ConSeal") to complain of a breach by ConSeal of the parties' contractual arrangement entitled "ME-TOO AND DATA AUTHORIZATION AGREEMENT" and a breach of the covenant of good faith and fair dealing. In substance, claimant alleged that ConSeal, having been given an exclusive right to copy, manufacture and sell a cleaning product owned by YClean (known as Ygiene or Ygiene206 and renamed by ConSeal as SteriCide), chose in or around July 2020 to cease manufacturing and marketing that product, in asserted violation of its obligations under the Me-Too Agreement. For this and other breaches, YClean principally seeks compensatory damages for its resultant loss of prospective royalties under the Agreement. Respondent in turn has denied that it breached any of its contractual obligations and has asserted three counterclaims for overpayment of royalties to YClean in view of the cancellation of a sale by ConSeal due to a defect in some containers of the product.

6. This controversy was placed with JAMS for resolution pursuant to section 10.1 of the Me-Too Agreement  Ex. R1). It specifies that "[a]ny controversy arising out of or relating to this Agreement or any modification or extension hereof shall be settled or otherwise resolved by binding arbitration under the auspices of JAMS - New York pursuant to the JAMS Streamlined Arbitration Rules."

7. Following the close of discovery, we conducted a two-day arbitral hearing on November 2 and 3, 2022. With the parties having filed post-hearing memoranda and rebuttals -- a process that concluded on January 3, 2023. -- we addressed the claims and defenses asserted in this case. In a Partial Final Award dated February 2, 2023, we dismissed the claims of claimant and upheld a counterclaim by respondent. At the same time we left for

further briefing several issues, including the nature of the relief to be granted respondent on its counterclaim, the amount of attorney's fees and other expenses to be awarded to respondent and the availability and amount of pre-judgment interest to be received by respondent. The parties have since provided briefing on these issues[1] and we now issue the Final Award, which includes an in haec verba reiteration of the Partial Final Award, together with our assessment of the remaining issues for adjudication.

I. The Provenance of the Parties' Relationship

The source of contention between the parties finds its origin with the development between 2005 and 2007 by Andy Kielbania of a ready-to-use sterilant product known as either Ygiene or Ygiene 206. (Tr. 67).[2] Mr. Kielbania developed Ygiene while working for an entity known as BioNeutral Group. That company then pursued required testing that permitted it subsequently to obtain registration by the Environmental Protection Agency and some states in or around 2010. (Tr. 84).

In the wake of registration, BioNeutral achieved limited sales of Ygiene, but those transactions were minimal, yielding probably less than $20,000.00 in revenue. (Tr. 83-84). Sometime thereafter BioNeutral ceased doing business, apparently in whole or in part as a result of the failure of its sales efforts. (Tr.

_____

[1] Claimant filed its opposition to respondents' fee-and-expense applications on February 24, 2023, although at the same time it voiced a conclusory objection to the fact that it had been given only one week for its filing, though it did not indicate that it was seeking more time. (Feb. 24, 2023 letter from Philip D. Neuer, Esq.). In response, we observed at that time that claimant had had the opportunity since February 2 to request additional time, and that even in mentioning its objection as part of its response, it had not sought more time. (Feb. 24, 2023 email from the Arbitrator). That said, we left open the possibility that it might still seek leave to supplement its offering (id.), but claimant did not do so.

[2] "Sterilants are capable of completely eliminating or destroying . . . all forms of microbial life [while] [d]isinfectants form a less absolute category – they will destroy some, but not necessarily all[,] organisms." https://www.google.com/search?rlz=1C1GCEA_enUS883US883&sxsrf=ALiC zsbrMksaR9UJ9hoUKLuL55U0zhGmyg:1671919647371&q=Are+sterilants+dis infectants%3F&sa=X&sqi=2&ved=2ahUKEwjpmrKFopP8AhXvNlkFHfHXBbYQzmd 6BAgUEAU&biw=1536&bih=722&dpr=1.25. (See Tr. 65).

85). At the time of its closure, its assets were acquired by Michael D. Francis, who had previously lent funds to BioNeutral, and took the assets, including the rights to Ygiene, in satisfaction of the company's pre-existing debt to him. Mr. Francis then created YClean to own the assets received from BioNeutral. (Tr. 12-13).

There is no dispute that YClean had no capacity to manufacture, market or sell Ygiene. Indeed, the company had no facilities or employees, and Mr. Francis, though an experienced businessman, had no prior commercial experience in marketing or sale of this type of product. (Tr. 49-50, 79). Given these circumstances, YClean looked for another company that might facilitate exploitation of its Ygiene rights. (Tr. 13).

ConSeal was founded in the 1970s by its principal chemist, Stephen Perry. It is a contract chemical manufacturer for a wide variety of chemical products. It generally undertakes research and development to create its own formulations and then manufactures the products pursuant to demand from interested companies, which in turn will market those products. (Tr. 286-88). ConSeal does not solicit potential clients, but receives expressions of interest by word of mouth. (Tr. 287).

Since YClean had no capacity to exploit its interest in Ygiene, it was looking for another entity that could do so. At the same time ConSeal was interested in adding an EPA RTU -- that is, ready-to-use (Tr. 294) -- sterilant to its inventory of cleaning products. It also turned out that the Ygiene formulation was based on paracetic acid -- the same technology as one of ConSeal's prior concentrate products, known as HyCide. (Tr. 294, 299).

Given this confluence of interests, Mr. Francis was introduced to ConSeal by an EPA consultant, Jean Killoren. (Tr. 293-94). The parties entered into the so-called Me-Too Agreement in or about August 3, 2016. As suggested by its title, that agreement was entered into in reflection of provisions of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), under the terms of which a party seeking registration of a product with EPA may rely on the testing and other safety and efficacy data previously provided by an earlier registrant of a product with the identical or substantially similar active ingredients. (Tr. 249-50; Ex. R51 at 4). The initial registrant may be entitled to compensation for the use of its data (Tr. 254-

4

55)[3], and the two parties are free to contract with each other to define the nature and scope of such compensation. (Ex. R51 at 4-5).

In this case the parties entered into an agreement that, by way of certain "whereas" clauses, specified (1) that YClean had title to and registration of Ygiene, (2) that ConSeal wanted to obtain a Me-Too registration for that product and the use of YClean's "registration efforts", together with "the rights to manufacture and sell the Product under ConSeal's own label and branding in the United States, including its territories and possessions and Mexico and Canada" (defined as "the Territory"), and (3) that YClean "wishe[d] to permit and assist ConSeal in obtaining registrations and data authorizations for the Product under the terms and conditions contained herein." (Ex. R1, three "whereas" clauses). Thus the Agreement explicitly authorized ConSeal to utilize the test data developed by or for BioNeutral when it pursued registration of Ygiene, thus enabling ConSeal to seek a Me-Too registration of SteriCide. (Id., para. 1.1). The Agreement specified that ConSeal "shall obtain and maintain all desired federal and state registrations for the Product." (Id., para. 1.2). It further provided that YClean "grants to ConSeal the right to manufacture the Product and the exclusive right to market and sell the Product in the Territory." (Id., para. 1.3). In implementation of these transactions, the contract provided that the grant of the right to manufacture and to market and sell the product included the right "to utilize all formulations of the Product, the EPA 'Me Too' registration [for Ygiene], intellectual property rights in and to the product for the [specific] purpose of granting CONSEAL its right to manufacture the Product and the exclusive right to market and sell the same in the Territory under CONSEAL's proprietary label . . . ." (Id.). By these terms YClean retained the rights to the names Ygiene and Ygiene 206 and the right to market and sell the product under these names outside the Territory. (Id.).

The Agreement went on to define the royalty fee that ConSeal was obligated to pay YClean, stating as follows:

---

[3] The newcomer may use the previously filed data without charge if the data is more than fifteen years old. (Ex. R51 at 5). If the data is of more recent origin, its supplier and the newcomer typically will negotiate a fee, although, failing agreement, the parties are consigned to arbitration on the amount of compensation. (Tr. 254-55; Ex. R51 at 4-5; see also Thomas v. Union Carbide Agric. Products, Inc., 473 U.S. 568, 573-74 (1985)(describing 1978 FIFRA amendment)).

> CONSEAL shall pay a perpetual royalty fee to YCLEAN . . . for each gallon of the product sold by CONSEAL as follows: (i) 0 - 20,000 gallon, the Royalty Fee shall be $2.00; (ii) 20,001 - 50,000 gallons, the Royalty Fee shall be $1.50/gallon; and (iii) {more than] 50,000 gallons, the Royalty Fee shall be $1.00/gallon.

(Id., para. 3.1). The Royalty Fee was to be calculated on a "cumulative basis" and paid quarterly for sales made the preceding quarter. (Id.). ConSeal was to supply quarterly sales reports to accompany the payment of quarterly royalties. (Id.).

The Agreement also contained a provision on termination. Apart from authorizing this step if ConSeal cancelled the product registration, it also stated that the rights contractually defined would terminate "if CONSEAL fails to continuously sell and market the Product throughout the Territory." (Id., para. 4).

Also included in the Agreement was a non-assignment provision. With a limited exception, it prohibited assignment of contractual rights without the written consent of the other party. (Id., para. 5). The contract also stated that it "contains the entire agreement of the parties with respect to the subject matter hereof and supercedes all prior communications, representations or agreements among the parties    . . . . whether [oral] or written." (Id., para. 12(b)). To similar effect, it specified that any modification or amendment of the contract must be in a signed writing if it was to bind a party. (Id., para. 14).

Finally the Agreement included an arbitration provision (id., para. 10.1) and further specified that the agreement was to be governed by the law of New Jersey. (Id., para.15).

II. <u>Performance Under the Me-Too Agreement</u>

ConSeal pursued EPA registration, which did not occur until July 3, 2017 (Tr. 72, Ex. R10), a delay apparently attributable, at least in part, to issues raised with certain of the data supplied by YClean to ConSeal. (Tr. 316). Following that step, ConSeal pursued and obtained registrations in each of the fifty states, and a qualified registration in Canada, a process that was completed in 2018. (Tr. 320-21, Ex. R34; <u>See also</u> Tr. 257-58, 263-64).[4]

---

[4] ConSeal was not able to obtain registration in Mexico. (Tr. 322-24).

In a further effort to maximize sales possibilities, in 2020, during the early phase of the COVID-19 pandemic, ConSeal succeeded in getting SteriCide included on the List N maintained by the EPA, a listing of disinfectants approved for use against SARS-CoV-2. (Tr. 264-65). Despite that success, its likely impact was limited, as SteriCide was listed with a 20-minute kill time based on the early testing of Ygiene 206 by BioNeutral (Tr. 270-71). That kill time placed it among the slowest-acting disinfectants on the list. Thus, of the 631 COVID disinfectants listed as of September 7, 2022, only three had a kill time in excess of 15 minutes, of which SteriCide was one. (Ex. R49; Ex. R41 (para. 63)). Of the 258 RTU products on the list[5], SteriCide was the only one with a kill time in excess of 10 minutes; 115 of these items had a kill time of less than three minutes. (Id.).

ConSeal first sold a small quantity of SteriCide in September and October 2018 to an entity known as Alpha Tech Pets (Ex. R35), but then sold, apparently exclusively, to its principal client, EcoClear. (See Tr. 292). Its arrangement with EcoClear was consistent with its more general practice in selling to clients, that is, leaving to the purchaser the role of marketing to retailers. (Tr. 377). This arrangement reflected the fact that ConSeal does not do its own marketing and selling to retailers, a task that in this instance fell to EcoClear. That company was equipped to engage in broad-based and sophisticated sales efforts for its acquired products, and in the process targeted major retailers. (Tr. 378-80).[6] Thus, ConSeal sold product -- including SteriCide -- outright to EcoClear, and not on consignment. (Tr. 292-93).

Early sales, in 2018, were very limited, as EcoClear found only limited demand from retailers -- a pattern consistent with the limited sales achieved by BioNeutral some years before. Thus the first sales, in March 2018, totaled 312 gallons, reflecting revenue of $8,046.00. The next sale was in September 2018, consisting of 179 gallons and generating $3,736.00, followed by October 2018 sales of 459 gallons, for $11,598.75 and December 2018 sales of 404 gallons, for $5,454.00. (Ex. R41 at 14; Ex. C2

---

[5] As noted, the designation RTU indicates that the product is "ready to use", rather than requiring dilution by the consumer. (Tr. 294).

[6] A major part of ConSeal's business is to design and manufacture products to meet a buyer's request. In such a scenario, ConSeal does not pay a royalty; thus its agreement to do so for YClear was unusual. (Tr. 427-28).

at 9-10). No further sales were recorded until August 2019, when ConSeal sold another 2,016 gallons for $33,912.00. (Ex. R41 at 14).

The remaining sales of SteriCide all took place in certain months in 2020, the first year of COVID-19. In January ConSeal achieved a sale of 3,480 gallons, yielding $52,320 in sale revenue. The remaining sales took place in the period May to October 2020, the height of the first year of COVID. These sales far exceeded earlier transactions[7] and are listed as follows:

| Month | Gallons | Revenue |
|-------|---------|---------|
| May 2020 | 19,200 | $333,600.00 |
| June 2020 | 56,684 | $860,664.00 |
| July 2020 | 28,800 | $388,800.00 |
| August 2020 | 43,368 | $761,548.00 |
| Sep't 2020 | 36,000 | $672,000.00 |
| Oct. 2020 | 3,591 | (Not listed) |

(Ex. R41 at 14, 16). Thus total sales through October 2020 amounted to somewhat more than $3 million.

EcoClear has not renewed its purchases of SteriCide since October 2020. As explained by its President, Christopher Stidd, the relatively brief success of the product during a portion of 2020 was attributable to the ebb and flow of consumer demand and supply triggered by the impact of the COVID pandemic. In the early Spring of 2020 there was a consumer run on disinfectants, as the CDC recommended special care to cleanse surfaces of viruses and bacteria. Because of the intense demand in the early

---

[7] The amounts reported here -- from the report of respondent's expert Marcie D. Bour -- deviate modestly between different tables and from the numbers summarized by claimant's damages experts, Kristin K. Kuscma and A.E. Rodriguez (compare Ex. R41 at 14-16 with Ex. C2 at 9-11), but the differences are not material for present purposes. We also note that, based on our assessment of liability, we do not address the conflicts between the parties' respective damages experts, who differ dramatically in their findings.

months of 2020, numerous retailers saw their inventory of popular brands, such as Clorox, Lysol and Purell, exhausted, a development that led to orders by the retailers for less known products such Stericide. It appears that large retailers, such as Walmart, Home Depot and Lowe's, ordered significant quantities of these hitherto disfavored products, as the supply chain did not initially provide a continuing and adequate supply of the main brands.[8] That pattern appears to have triggered the very substantial orders by EcoClear from May through September 2020. (Tr. 384-87).

The record reflects as well that by the end of this period the large retailers determined that they had an excess of such inventory and that the popular brands -- notably Clorox, Lysol and Purell -- were being restocked by their manufacturers. (Tr. 387-88). Indeed, that trend was reflected in some efforts by retailers to return or destroy those lesser-known products from their inventory (Tr. 388-90, 412) and, more strikingly, by their decision to slash the prices of SteriCide, a trend that continued through 2021 and into 2022. (Tr. 390-92; Exs. R29, R30). It followed that there was no continuing demand for a supply of SteriCide by the retailers, and thus a consequent stoppage of orders from EcoClear. (Tr. 387-88). Indeed, EcoClear accepted returns or losses from retailers of more than $200,000.00 in SteriCide that the retailers were unable to sell, a loss that EcoClear absorbed. (Tr. 412-14).

According to Mr. Stidd, despite this radical downturn, some retailers continue to attempt to market Stericide, as reflected in documentary evidence of retail pricing through February 2022 (Tr. 390-92, 394; Exs. R29, R30), and testimony summarizing the efforts by EcoClear to promote the product at trade shows and in other marketing venues, including Amazon and EcoClear's own web site. (Tr. 394-95, 398-401; Exs. R32 & R33). Indeed, a review of internet sources demonstrates that SteriCide remains on the market, albeit at reduced prices. See, e.g., https://efaidnbmnnnibpcajpcglclefindmkaj/https://www3.epa.gov/pesticides/chem_search/ppls/058300-00025-20200604.pdf; https://www.amazon.com/Stericide-774670-Sterilant-Gallon-Clear/dp/B07HPXX965?ref_=ast_sto_dp.

---

[8] We take judicial notice that this pattern of exhaustion of commonly stocked household products during the early phase of COVID19 extended to many other items, notably including toilet paper and paper towels. See, e.g., https://cnr.ncsu.edu/news/2020/05/coronavirus-toilet-paper-shortage/.

It bears mention as well that since the collapse of retailer demand for more SteriCide, ConSeal has retained the availability of three lines for use in producing the product, and retains an inventory of both manufactured SteriCide and the raw materials needed for further production in the event that willing purchasers can be located. (Tr. 333, 340, 467). In complementary fashion, Mr. Stidd reports that EcoClear is still presenting Stericide for sale at trade shows and on its website and is currently working with a New York distributor to introduce the product in New York. (Tr. 394-95, 398-99; Ex. R33**)**.

III. <u>The July 1, 2020 Correspondence</u>

During the period from April to July 2020, EcoClear and ConSeal were repeatedly contacted by an individual named Alan Levine (and later Terry Wong), purporting to represent Chinese commercial interests who expressed a desire to acquire some quantity of SteriCide. (Tr. 395, 448-54). ConSeal initially indicated a lack of interest in this approach –- which would have involved sales outside the territory defined by the Me-Too Agreement. (Tr. 448-53).[9] Eventually, on July 1, 2020 ConSeal relented and contacted Mr. Francis by letter from its Chief Operating Officer, Donna Rosetti, requesting an expansion of the Territory or even the outright sale of the business to ConSeal. (Tr. 454; Ex. R23). After a brief back-and-forth with counsel for YClean (Ex. R24), nothing came of this inquiry, apparently as a result of a lack of interest by YClean. (Tr. 58, 458-59, 463).[10]

_____

[9] Claimant suggests that, despite the contractual limitation of the "Territory" to North America, ConSeal had the right to sell to China and elsewhere on a non-exclusive basis. (Cl. Post-Hearing Mem., 13). That assertion is inconsistent with the governing contract. The Agreement left the ownership rights to the data with YClean, and the only sales right assigned to ConSeal was for the North American territory. The fact that those assigned sales rights were exclusive does not translate to a <u>sub silentio</u> provision assigning non-exclusive rights to ConSeal for the rest of the world.

[10] Mr. Francis claimed that he turned down ConSeal's request because it failed to provide him details necessary to determine the value of a China deal. (Tr. 61). In contrast, Ms. Rosetti insisted that Mr. Francis had responded that he would expand the territory for ConSeal but exclude Asia and that he demanded a doubling of the royalties. (Tr. 458-59). We need not resolve this conflict, but find in general that Ms. Rosetti's testimony was entirely credible.

In addition, EcoClear never sold to China. (Tr. 396-97). Although ConSeal was not aware of it at the time, Messrs. Levine and Wong had apparently previously approached YClean directly about a sale of Ygiene product for China, and that contact had elicited no agreement from claimant. (Tr. 90-91, 55-58).

IV. <u>Sales Efforts After October 2020</u>

According to Mr. Stidd of EcoClear, from October 2020 on, orders from retailers for Stericide ceased, as the traditional products began to flood the market. He further testified that a number of major retailers, having been left with large remaining and unsaleable inventories of Stericide, undertook to return some of this product to EcoClear or to destroy some of the stock. Given the terms of sale between EcoClear and these retailers, EcoClear absorbed the loss represented by these returns and destroyed inventory. Since, however, EcoClear had acquired title to this Stericide from ConSeal, there was no charge back to ConSeal nor any effect on the calculation and payment of royalties to YClean.(Tr. 387-89).

V. <u>The August 2021 Return of Product by EcoClear</u>

In the late Summer of 2021, EcoClear returned 40,076 gallons of SteriCide to ConSeal, all contained in one-gallon bottles, because of a product defect. Specifically, because of the properties of the acid used in the production of SteriCide, those containers exhibited a phenomenon known as "off-gassing", which placed severe pressure on the interior of the container, distorting the appearance of the one-gallon bottles containing the SteriCide and causing leaks of the acid-infused liquid. (Tr. 397-98, 333-36). Because of that defect, including the leakage of the liquid and resultant damage to the warehouse floor of EcoClear, ConSeal accepted the return and credited EcoClear with $541,026.00, representing the purchase price of the damaged items. (Ex. R40). ConSeal has since repackaged the Sterilant into a set of 55 gallon drums, and they remain as part of the inventory held by ConSeal. (Tr. 335). This product had never been sold by EcoClear to a retailer, but had been in EcoClear's custody as inventory until the defect was noted and the items returned to ConSeal. (Tr. 411).

Long before the return of the SteriCide by EcoClear, ConSeal had paid YClean the royalties triggered by the sale of the 40,076 gallons to EcoClear, a sum amounting to $40,076.00. (Tr. 466). In this proceeding ConSeal has demanded, in the form of a series of counterclaims, that YClean refund that money, as the sale on which the royalty was premised has been cancelled because the

11

SteriCide containers proved to be damaged. (Resp. Post-Hearing Mem., 25-26).

Claimant has opposed that claim on a variety of grounds, including its asserted suspicion that the entire return transaction was fictitious and designed only to give respondent "leverage" in this arbitral proceeding. (Cl. Post-Hearing Mem, 27-30).

VI. <u>YClean's Claims</u>

In claimant's initial description of its claims, it offered very little guidance, asserting only that respondent was responsible for "[n]umerous [m]aterial [b]reaches of Contract dated August 3, 2016." (Demand for Arbitration at 3/7). In a follow-up Amendment and Supplement, claimant was more forthcoming, listing a number of variants on a series of claims that respondent had breached the Me-Too Agreement and a covenant of good faith and fair dealing.[11] We summarize these claims briefly below.

1. Respondent impermissibly "sub-contracted the marketing and selling obligations to a third-party" -- apparently a reference to the role of EcoClear. (Amend. 6(B)).

2. Respondent impermissibly "assigned some or all of its rights and obligations under the Agreement to a third-party", an apparent repeat of the preceding allegation. (<u>Id.</u>, 6(C)).

3. Respondent breached the Agreement when it "manufactured for sale by its marketer a product which was not Claimant's Product." (<u>Id.</u>, 6(D)).

4. Respondent and EcoClean "neglected to properly market and sell Claimant's Product". (<u>Id.</u>, 6(E).

5. Respondent reported zero sales for the last 18 months and paid no royalties during that period. (<u>Id.</u>, 6(F) & (G)).

6. On information and belief, respondent has conspired with others "to engage in unfair business practices relating to alleged returns of merchandise." (<u>Id.</u>, 6(I)).

---

[11] Claimant also referred to the breach of a parallel Non-Disclosure Agreement ("NDA") (Cl. Amend. & Supp., para. 6), but never articulated any provision of the NDA that respondent purportedly violated.

7. "In or around July 2020", after claimant rejected its demand that the "approved territory . . . be dramatically expanded," respondent "expressed anger" and, on information and belief, ceased performing its obligations under the Agreement and breached the implied covenant of good faith and fair dealing. (Id., 6(J) & (K)).

For relief claimant sought:

1. An accounting of all sales since the start of the Me-Too Agreement on August 3, 2016;

2. An inventory of unsold product manufactured by respondent;

3. An order requiring respondent to surrender all inventory to claimant;

4. Compensatory breach damages and prejudgment interest;

5. Punitive damages;

6. A declaration that the Me-Too Agreement has been terminated;

7. Reasonable attorney's fees and costs of the arbitration.

(Id., fourth-fifth pages). It bears noting that in claimant's initial post-hearing memorandum, it withdrew the first three demands for relief. (Cl. Post-Hearing Mem., 4-6). Thus it currently appears to seek only monetary relief.

Finally, we note that in claimant's post-hearing memoranda it appears to add a somewhat different legal claim, contending that respondent fraudulently induced it to enter into the Me-Too Agreement. The premise for that contention is the assertion that Mr. Perry misled Mr. Francis into believing that ConSeal would do its own marketing even though that company does not do traditional marketing to retailers but rather sells to an intermediary client -- notably EcoClear -- and leaves EcoClear to do the marketing to retailers. (Cl. Post-Hearing Mem., 21-23; Cl. Reply Mem., 2-3).

VII. ConSeal's Pleading and Counterclaim

Respondent filed a Response to the Demand for Arbitration, in which it asserted a general denial, invoked a number of

13

affirmative defenses, and asserted three parallel counterclaims. The counterclaims are all premised on the 2021 return of defective product by EcoClear. ConSeal alleges that it "was forced to accept a return of approximately 40,000 gallons of product from previous sales to [EcoClear] due to no fault of ConSeal" and was thus "forced to refund to [EcoClear] the amounts originally paid by [EcoClear] . . . for the returned product." (Counterclaims, para. 8). Respondent therefore asserts that claimant is in possession of an overpayment of the contractual royalty fee in the amount of $40,076.00. (Id.). Based on these allegations, ConSeal asserts counterclaims for breach of contract, "open account" and unjust enrichment, all in the amount of $40,076.00. (Id., paras. 12-26).

VIII. <u>Claimant's Response</u>

YClean has opposed the ConSeal counterclaims on a variety of grounds, including non-compliance with New Jersey law, breaches by respondent that preclude any recovery on its part, and fraud by ConSeal stemming from its use of "subcontractors to market and sell the Product." (Cl. Answer, fourth-sixth pages).

IX. <u>Assessment of YClean's Claims</u>

As indicated, at various points claimant has offered a potpourri of grounds for an award of damages. Ultimately, the record fails to justify any of them.

A. <u>The Contract-Breach Claims</u>

Based on claimant's pleadings, his principal claims are contractually based. To prevail on a contract claim under New Jersey law, a plaintiff must establish "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiffs' alleged damages." <u>Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.</u>, 737 F.3d 879, 900 (3d Cir. 2013). The Supreme Court of New Jersey has instructed that "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction", and it must be enforced "as written." <u>Id.</u> (quoting <u>Kutzin v. Pirnie</u>, 124 N.J. 500, 507, 591 A.2d 932 (1991)).

One asserted claim by YClean -- articulated in its supplemental pleading -- is that respondent breached the Me-Too Agreement because the product that it manufactured and distributed was not identical to the Ygiene product that is the

14

subject of the Me Too Agreement. (Cl. Amend. & Supp., para. 6(D)). The record is devoid of any evidence that there was a material deviation between Ygiene and the SteriCide product licensed, manufactured and sold by ConSeal. Indeed, the record is plainly to the contrary. The point of the Me-Too Agreement was to permit ConSeal to use the test results from the Ygiene EPA filing to form the basis for a license for SteriCide, and the approval by EPA of a Me-Too application was premised on a finding that the active ingredients of the new product are identical to, or substantially the same as, the ingredients of the earlier product. (Tr. 249-50, 259-60). The evidence reflects that the same data were utilized for both products and that EPA approved the licensing of Stericide because its active ingredients mimicked those of Ygiene. (Tr. 257-63; Exs. R12, R13, R55).

Another line of attack by YClean focuses on the fact that ConSeal sold virtually all of its SteriCide to EcoClear, which in turn marketed the product to retailers. Claimant in substance seems to argue that under the Me-Too Agreement ConSeal was obliged to do its own marketing and sales to retailers, and that its sale to EcoClear without a direct outreach to retailers somehow breached its obligations in this respect. (E.g., Cl. Post-Hearing Reply, 2-3; Cl. Amend. & Supp., paras. 6(B) & (C)).[12] This argument misreads the contract, and fails as well for the separate reason that claimant entirely fails to prove -- as it must -- that the challenged arrangement caused it any damage. See, e.g., EnviroFinance Group, LLC v. Environmental Barrier Co., 440 N.J. Super. 325, 344, 113 A.3d 775, 787 (Super. Ct. App. Div. 2015)(contract damages must be proven).

The Me-Too Agreement gave ConSeal the exclusive right to manufacture, market and sell the copy of Ygiene (that is, SteriCide) in North America. The contract did not dictate how ConSeal was to market and sell the product, and the exclusivity provision was plainly designed solely to protect ConSeal, in that it would not face any competition by an identical product within the defined territory. The arrangement by which ConSeal sold almost all of its Stericide to EcoClear was entirely consistent with the terms of the contract. ConSeal manufactured and sold the product, which in turn triggered payment of royalties to YClean, and left to EcoClear the task of marketing and selling to the retailers. Although ConSeal does not itself engage in traditional marketing of products to retailers, that was the heart of the EcoClear business operation, which was thus incentivized to

---

[12] As we note below, this point is also marshaled by claimant in support of a newly-articulated claim of fraudulent inducement.

maximize retailer demand for SteriCide. Thus, it made perfect
sense for these two entities to undertake their separate roles --
ConSeal to manufacture and sell to the middleman, and EcoClear to
market and sell to the retailers. It also bears emphasis that the
revenue payable to YClear was protected irrespective of the price
charged to EcoClear by ConSeal, since royalties were payable on
the basis of volume sold, not revenue generated.

It bears further emphasis that the credible evidence is that
YClean was aware from the outset that the business model followed
by ConSeal involved sales to a middleman, which would in turn
market to the retail sector. That was the testimony proffered by
ConSeal (Tr. 436-38, 473), and although Mr. Francis and Mr.
Kielbania testified otherwise (Tr. 16-17, 70-71), their assertion
is simply not persuasive. YClean was engaging in the disposition
of its main or only product -- a transaction of considerable
potential consequence for the company —- and Mr. Francis, as a
self-described experienced businessman (Tr. 8-12), would have had
every incentive to understand the material details of the
business conducted by ConSeal before agreeing to the transaction.
There is also no reason to infer that ConSeal -- a long-term
participant in the relevant industry -- would have had any reason
to misrepresent its business model.[13]

Apart from failing to demonstrate a breach of the Me Too
Agreement in this respect, claimant fails to demonstrate any
resultant damage from the purported contract breach. Since
ConSeal does not engage in the sort of marketing supposedly
envisioned by YClean, there is no reason to believe that if it
had chosen -- for the first time -- to shoulder that burden
itself rather than leaving it to EcoClear, the result would have
been to increase sales above that achieved through the reliance
on EcoClear's efforts to generate sales, which succeeded through
early October 2020. Indeed, the record reflects that, because of
the unique effects of the pandemic on sales and on inventory of

---

[13] We note that in an email from 2018 addressed to Mr.
Francis, Ms. Rosetti made explicit reference to its use of a
distributor, an observation that plainly did not then trigger
either an inquiry or a protest from YClean, despite the fact that
almost no sales had yet been achieved. (Ex. R14). We infer that
claimant was satisfied that ConSeal was an experienced and
reputable company. It plainly appears that claimant's current
accusation of misdeeds based on the role of EcoClear was
triggered by claimant's subsequent dissatisfaction with the fact
that SteriCide, after gaining a brief but substantial market
share, is now on the proverbial competitive sidelines.

the traditional brands, EcoClear was extremely successful in the earlier phases of the COVID era in generating and exploiting demand by major retailers for what was otherwise a virtually unknown product and one that was not well suited to household use. (E.g., Tr. 299-300, 385-86, 388).

Claimant also appears to allege that the marketing campaign by EcoClear as a substitute for expected efforts by ConSeal was inadequate. (Cl. Amend & Supp., para. 6(E)). Apart from the fact that the contract did not impose any specific requirements as to the manner in which marketing was to be carried out, the record shows that EcoClear was singularly successful in placing SteriCide in the major retailers in considerable quantities when there was a real market for it -- notably from May through September 2020 -- and there is no evidentiary basis to criticize those marketing efforts.[14]

Claimant presses the further argument that ConSeal was obligated under the contract to continuously market and sell Stericide, irrespective of market conditions, and that it deliberately and maliciously stopped doing so in or around early July 2020, because at that time YClean declined its request for an expansion of the contractual exclusive sales territory to allow for sales in China. According to claimant, this stoppage constituted a contract breach. This argument fails in view of both the terms of the Me-Too Agreement and the evidence of respondent's sales performance.

The contract was designed to allow respondent to utilize the test data of the claimant's product in exchange for a sales-volume-based royalty. The benefit to respondent was cost-saving and permission to manufacture and sell the equivalent of claimant's Ygiene. For YClean, the Agreement allowed it to potentially monetize its rights to the Ygiene product even though it had no capacity itself to manufacture and sell that item. Neither party stood to benefit if ConSeal failed to exercise its rights acquired under the Me-Too Agreement. Presumably because of that incentive for ConSeal to exploit its acquired rights, the contract contains no provision requiring that respondent actually proceed to manufacture and sell SteriCide, much less impose some minimum level of sales or even any specific defined efforts to market and sell the product. Instead the Agreement protected

---

[14] In any event, as noted, the contract did not purport to place on ConSeal any mandate to conduct its selling efforts in any specific manner, much less dictate a required minimum success rate in those efforts.

YClean in two ways -- by creating the noted incentive for ConSeal to exploit the rights it acquired through the Agreement and by the provision giving YClean the right to terminate the Agreement if ConSeal failed to continuously market and sell.[15]

Claimant's contract-breach claim therefore fails for two reasons. First, the contract did not oblige respondent to pursue manufacture and sale. Second, the evidence shows that ConSeal did undertake continuing efforts to manufacture and sell SteriCide during and after the period when there was a demand for the product -- efforts that generated substantial revenues and significant resultant royalties for YClean, including substantial sales after July 1, 2020. In short, ConSeal did not breach any contractual obligation, and claimant also fails to demonstrate that it suffered any damages from the performance by respondent.

We note that in resisting these conclusions, claimant appears to advance several other criticisms of respondent's performance under the contract, although it does not explicitly argue that these alleged failings constituted a breach. Thus, at one point YClean seems to argue that ConSeal took an excessive amount of time obtaining EPA registration and then registrations from the fifty states. It also appears to suggest that respondent could have started selling earlier than 2018 because it was not required to wait for these registrations. These arguments are bogus for several reasons. We note that the original EPA registration of Ygiene by BioNeutral appeared to take at least as much time even though it did not register Ygiene in many states (Tr. 84). That observation is consistent with the testimony of respondent's industry expert, Kevin Kutcel (Tr. 257, 263) (referring to EPA registration), and the undisputed fact that during the SteriCide registration process, ConSeal was required to undertake an amendment of the data on efficacy because EPA had altered its standards for the relevant part of the efficacy test data, thus prolonging the process. (Tr. 261-63). The additional burden of seeking and obtaining fifty state registrations only added to the length of time required before the product was placed on sale.

---

[15] As ConSeal correctly notes, the Agreement, which reflects input by attorneys for both parties (Tr. 51), characterizes the company's role, in part, as "obtain[ing] and maintain[ing] all <u>desired</u> federal and state registrations for the product." (Ex. R1, para. 1.2 (emphasis added)). That wording itself reflects the level of discretion left to ConSeal in pursuing the marketing and sale of SteriCide.

As for claimant's assertion that ConSeal could have marketed SteriCide prior to the issuance of registrations (Cl. Post-Hearing Mem. 9-10) -- either as a detergent or as a deodorizer -- that argument is obviously meritless. To market the product for any of its designed purposes -- as a sterilant or a disinfectant -- respondent needed the relevant registrations.  (Tr. 76-78). Claimant's apparent assumption is that respondent could have marketed the product for another purpose -- for example, as a deodorizer -- but it would have had no utility for such lesser uses, and such an effort would surely not have triggered sales. (Tr. 317-18).

B. <u>The Breach-of-Covenant Claim</u>

Claimant's alternative legal theory is that respondent breached the implied covenant of good faith and fair dealing by allegedly ceasing its efforts to market SteriCide, a self-inflicted injury that was undertaken in supposed retaliation for the refusal of YClean to grant it worldwide rights. This argument also fails.

Under New Jersey law "[a]n implied covenant of good faith and fair dealing is inherent in every contract." <u>Kocher v. UC Overlook Dev., LLC</u>, 2010 WL 1655906, *6 (Super Ct. App. Div. April 22, 2010). "[A] party exercising its right to use discretion . . . under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. They do not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose." <u>Wilson v. Amerada Hess Corp.</u>, 168 N.J. 236, 251, 773 A.2d 1121, 1130 (2001). That said, the party asserting such a claim bears the burden to demonstrate that the other side was motivated by malice. As the New Jersey Supreme Court has emphasized,

At the same time, the test must recognize the mutuality of expectation and enforce a party's contractual right to exercise discretion . . . based on its own reasonable beliefs concerning business strategy. In that setting, an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive. . . . Without bad motive or intention, discretionary decisions that

happen to result in economic disadvantage to the other party
are of no legal significance. . . . Bad motive or intention
is essential, for, as stated by the . . . Seventh Circuit,
"[c]ontract law does not require parties to behave
altruistically toward each other; it does not proceed on the
philosophy that I am my brother's keeper."

Id. at 251-52, 773 A.2d at 1130 (citing cases & quoting Original
Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies,
Ltd., 970 F.2d 273, 280 (7th Cir. 1990)).

Claimant's legal theory rests on two elements -- that the
obligation to continue selling Stericide is implicit in the Me-
Too Agreement even if not explicitly so defined, and that
respondent ceased to do so for a malicious or wrongful purpose,
that is, to retaliate against YClean for its refusal to grant
ConSeal an expanded exclusive territory. For purposes of our
analysis, we assume that the obligation to make reasonable
efforts to sell is implicit in the agreement, but claimant fails
to demonstrate either that ConSeal failed to act reasonably in
seeking to maximize sales -- an area plainly left by the
Agreement to ConSeal's discretion -- or that it acted with
malicious or otherwise evil intent in ceasing to make such sales
starting in July 2020, or even after early October 2020.

As noted, the record reflects that ConSeal chose to follow
its own business model by selling almost exclusively to EcoClear,
and leaving to that company's experience and expertise the
responsibility for marketing to retailers. That discretionary
choice was plainly reasonable given the divergent expertise of
the two entities. The record further reflects that this
arrangement worked well and to the benefit of YClean as well as
ConSeal during the period of time when demand for replacement
detergents skyrocketed due to the unusual circumstances created
by the early phase of the COVID-19 pandemic, including the
disappearance of name brands from retailers' shelves and the
resultant huge demand for substitutes, including SteriCide.

The record further reflects that ConSeal did not cease to
attempt to sell SteriCide when YClean rejected its request for
world-wide rights, but rather that retailers in the Fall of 2020
were confronted with an excess of that product in their inventory
and thus stopped ordering it as the name brands once again became
available in large volume, thus leading EcoClear to stop
purchasing more Stericide from ConSeal. (Tr. 387-88). The
credibility of this innocent explanation for the end of demand
for this product is underscored by the implausibility of

claimant's theory about ConSeal's motivation. Given the volume of sales that took place through September 2020, respondent was realizing substantial revenues, and indeed had even earlier expanded its manufacturing capability for this product. (Tr. 456, 463, 467). A decision to cease selling SteriCide -- if we assume that heavy demand continued apace after the Summer of 2020 -- would have cost the company dearly in terms of revenue forsaken. There is not a shred of evidence to support claimant's implicit contention that respondent was so consumed with anger at the rejection of its expansion proposals that it willingly inflicted such a financial loss on itself.[16] And indeed the record reflects that sales continued to be made through September and early October 2020, to the substantial benefit of YClean as well as ConSeal, and those sales only ended when the retailers themselves stopped ordering the product, as Mr. Stidd testified, because their inventory of SteriCide was no longer saleable.

In short, claimant's covenant-based claim fails for lack of proof.

C. <u>Fraudulent Inducement</u>

Although not included in claimant's pleadings, YClean appears to press, or at least allude to, a fraudulent-inducement claim in its post-hearing briefing. (Cl. Post-Hearing Mem., 21-23; Cl. Reply Mem., 2-3).[17] The premise for that claim is the assertion that ConSeal's representatives -- either Mr. Perry or Ms. Rosetti -- assured Mr. Francis or Mr. Kielbania that ConSeal was capable of marketing SteriCide to retailers and would do so directly if given the rights to distribute that product based on the test data from the Ygiene registration. Claimant suggests that this representation was knowingly false in that respondent now concedes that it never does its own marketing, but rather depends on its customers, including intermediaries such as EcoClear, to do traditional marketing to the retailers. Claimant's theory thus also rests on the somewhat unspoken

_____

[16] Ms. Rosetti was clear in her testimony, in which she denied that she or Mr. Perry had intended to punish YClean for limiting ConSeal to North America and had simply continued to supply the market covered by the parties' contract. (Tr. 462-63). Her testimony in this respect is entirely credible. There was simply no rational basis for ConSeal to cut off what had to that time been a profitable commercial endeavor.

[17] Claimant focuses on this theory principally as a predicate for its contention that it should be awarded punitive damages.

21

premises (1) that if respondent had truthfully communicated the limits of its intended role in marketing, claimant would not have entered into the Me-Too Agreement as drafted (or perhaps not at all) and (2) that by entering into that Agreement claimant suffered measurable injury.

"In order to establish a claim for fraudulent inducement, five elements must be shown: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." RNC Sys., Inc. v. Modern Tech. Grp., Inc., 861 F.Supp.2d 436, 451 (D.N.J.2012). See also Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624, 432 A.2d 521, 524 (1981). If such a claim were upheld, the normal relief would be rescission of the agreement or, if that were not practicable, an award of rescissory damages, designed to place the plaintiff in the position in which it would have found itself absent the challenged inducement to enter into a contract. See generally Prudential Ins. Co. of America v. Goldman Sachs & Co., 2013 WL 1431680, *8 (D.N.J. 2013).

The shortest answer to claimant's set of assertions is that we do not credit its allegation that ConSeal representatives misrepresented the role of the company in the selling of Stericide. (Tr. 436). We further see no basis to infer that a fuller explanation as to how respondent would endeavor to market the product would have deterred claimant from entering into the Me-Too Agreement. YClean was interested in finding a mechanism to monetize its interest in Ygiene, and the agreement with ConSeal served that purpose by tasking ConSeal with arranging for registrations, undertaking the manufacturing process and arranging sales of product to any interested buyer. By respondent's arrangement with EcoClear, it ensured that this virtually unknown product -- which by virtue of its makeup as an acid-based sterilant was not a comfortable fit for household use -- nonetheless was seized upon by the most prominent large-scale retailers when the circumstances called for a temporary replacement of all of the big-name brands. Moreover, as noted, because royalties to YClean were based on the volume of the product sold by ConSeal and not the price, it was irrelevant to claimant whether ConSeal could have driven a better price from the retailers than was obtained by EcoClear.[18] The claim further fails since claimant did not offer any evidence that it would

---

[18] In any event, claimant never proffered any evidence relevant to that question.

have benefitted by not entering into the Me-Too Agreement with
ConSeal. The record strongly suggests that ConSeal achieved the
maximum sales available under the circumstances, and if claimant
had chosen not to enter the Me-Too Agreement, there is no reason
to conclude that it would have derived more revenue than was
yielded by its chosen path (or indeed any revenues).[19]

D. <u>Request for Declaratory Judgment</u>

In claimant's pleading, it seeks a declaration that the Me-
Too Agreement is terminated. The premise for that request was
presumably the contention of claimant that ConSeal has breached
either the contract or the good-faith covenant by no longer
manufacturing, marketing or selling SteriCide. In claimant's
briefing, however, it does not mention this application, and,
indeed, in its post-hearing submission it explicitly drops its
demand for an accounting of inventory and the surrender of that
inventory from respondent to YClean; instead, it seems to seek
only damages. (Cl. Post-Hearing Mem., 4-6).

In view of the ending of sales in October 2020, it is
perhaps arguable that claimant would be justified in exercising
its contractual right of termination. We note further that
respondent concedes that the contractual relationship may not be
sustainable in the wake of claimant's resort here to litigation.
(Resp. Reply Mem., 19-20). All of that said, there is no need for
us to order the contract terminated; claimant has a right on its
own to do so in appropriate circumstances, and we understand that
such a step, if taken, will likely not be opposed by ConSeal.[20]
In short, for present purposes we view the Agreement as still in
effect.

---

[19] Entirely apart from these failings, a fraud claim would
fall short because YClean is, in substance, arguing that the
misrepresentation about respondent's role as a marketer was
intrinsic to what it claims was respondent's contractual
obligation. Seen in this light, the claim would be barred by the
economic loss doctrine. <u>See</u>, <u>e.g.</u>, <u>Bergen Beverage Distributors
LLC v. Eastern Distributors, Inc.</u>, 2022 WL 833373, *9 (D.N.J.
March 21, 2022).

[20] In view of the testimony of Mr. Stidd concerning the
continuing efforts to promote SteriCide, it is not glaringly
obvious whether a termination of the Agreement will be elected by
claimant.

X. Assessment of ConSeal's Counterclaims

Via three parallel counterclaims, Conseal seeks recovery from YClean of the sum of $40,076.00. (Counterclaims, para. 8). These claims are all based on the assertion that, starting in August 2021, ConSeal was required to accept the return from EcoClear of more than 40,000 previously purchased but defective one-gallon containers of SteriCide, a step that was accompanied by ConSeal crediting EcoClear with more than $540,000.00 on account of the defect. (Exs. R40, R39). According to respondent, that credit had the effect of reducing the total royalties owed to YClear by $40,076.00. Since those royalties had been paid to claimant before the return -- presumably prior to the end of sales of Stericide in October 2020 -- ConSeal contends that YClean is in possession of royalties that it is not owed and should be compelled to surrender those funds. (Resp. Post-Hearing Mem., 25-26).

YClean opposes. In doing so, it argues multiple grounds for denial. First, it seems to assert that the Me-Too Agreement has no provision calling for such a return of paid royalties, at least if they were correctly calculated and credited in the first place. Second, it argues that ConSeal had no obligation to accept the returns from EcoClear and surrender the sales revenue. In this respect, it seems to suggest that the defect -- an off-gassing that at some point after delivery to EcoClear caused the containers to expand and leak -- may have resulted from the failure of EcoClear to dispose of the inventory within the one-year period that was assertedly the limit of the SteriCide shelf life. Third, it asserts that the entire claimed return transaction is fictional, and reflects a last-minute attempt by ConSeal to gin up a bogus claim to give it "leverage" in the context of this arbitral proceeding. Fourth, it suggests that if there was a product defect, that was the fault of ConSeal, which had the responsibility for manufacturing the product, and the financial fallout of that failing should not be visited on YClean. We address these arguments below.

The first question is whether the Me-Too Agreement precludes any adjustment of already paid royalties irrespective of circumstances that cause cancellation of the triggering sale. Claimant so assumes by contending that the payment of the royalty is conclusive. We do not agree that this result follows irrespective of circumstances.

The contract does not explicitly address the scenario of a sale, payment of a royalty, and a subsequent event that requires cancellation of the sale. That said, we view the governing

24

contractual provisions as not inconsistent with the potential for a required surrender of a royalty based on at least some post-sale events, including particularly a <u>bona</u> <u>fide</u> necessity to retroactively cancel the sale. The royalty is a reflection of what amounts to a financial sharing by the contracting parties in the revenue generated by a sale, and thus there is a colorable basis for a sharing of the risk that a sale may have to be unwound. Cf. <u>Regency Oldsmobile, Inc. v. General Motors Corp.</u>, 1988 WL 36336, *1-6 (D.N.J. April 19, 1988). In this respect we note that the Agreement contemplates what amounts to a version of an open account that is to be calculated "cumulative[ly]" (Ex. R1, para 3.1), thus requiring that past transactions affect the calculation of royalties on later transactions.[21] This system seems to hinge on accurate recording of past transactions, including the effect of a cancellation of a sale.[22]

We further observe that if claimant's interpretation were adopted, in the current circumstances that would create the potential for YClean to be paid twice for the sale of the same batch of SteriCide. As noted, the first sale was made to EcoClear and triggered a royalty payment. Because of the sale cancellation, however, the same batch of the product is now back in the ConSeal inventory and available again for sale. Under claimant's approach, if it is subsequently sold, that transaction will trigger still another payment of royalties to YClean. That anomalous result -- double payment for the sale of the same batch -- is inconsistent with the evident purpose of the contractual agreement to pay royalties, that is, a sharing with claimant of the sales revenues obtained by ConSeal.

All of that said, we infer a presumption of finality arising from the payment of a royalty on the sale of Stericide by

───────────────

[21] An open account has been described as "an unsettled claim or demand made by the creditor which appears in his account books." <u>Smith v. Davis</u>, 323 U.S. 111, 114 (1944). In this case the account was kept by ConSeal, but reflected not only obligations of the customer -- predominantly EcoClear -- but also Conseal royalty obligations to YClean.

[22] We read the Agreement as providing simply that completed sales of Stericide will entitle YClean to the payment of the specified royalties, the amount of which is calculated based on the total of gallons sold. If a sale is retroactively and properly invalidated, that may reduce the amount of royalties to which YClean is entitled regardless of whether the royalty has already been paid.

ConSeal. That presumption, however, is fairly read as potentially rebuttable in some circumstances, including particularly the required cancellation of a sale.[23] As for whether the circumstances encountered here justify that result, resolution of the question turns on an assessment of claimant's fact-specific arguments for retaining the royalty in question. We therefore turn to those arguments.

As noted, claimant suggests that the sale cancellation was fictional. We see no reason, however, to doubt that the off-gassing took place and that it triggered the return of the SteriCide and the refund by ConSeal to EcoClear. Testimony to that effect by Mr. Perry, Ms. Rosetti and Mr. Stidd was consistent and entirely credible, as well as supported by the contemporaneous documentation. There is no evidence supporting YClean's speculation to the contrary.

As for the allocation of fault, if any, for the off-gassing, the record does not support the notion that this phenomenon reflected any error by ConSeal in its manufacturing of the product and its container. It is conceivable that there was some error in production, but the record is not supportive of that speculation. In addressing this question, Mr. Perry explained that the paracetic acid in the product can cause pressure to build on the inside of the container, an occasional phenomenon that leads to damage to the container if the cap is not vented. As he testified, ConSeal did not use a vented cap because the venting would destroy the effectiveness of the Stericide by allowing the acid to escape. Instead, the judgment of the manufacturer was that it was preferable to risk damage to the container since the SteriCide could still be recovered in usable form and repackaged. (Tr. 333-34). Indeed, according to Mr. Perry, that is what occurred in this instance, as ConSeal repackaged the fluid in 55-gallon drums and placed those drums in its inventory of SteriCide at the ConSeal warehouse. (Tr. 335). There is no evidence to contradict this account of events.

YClean further contends that ConSeal had no obligation to accept a return of the product -- particularly in view of its age -- and it seems to argue that this fact precludes recovery of the royalties. That argument is not sustainable.

---

[23] We assume for present purposes that the required justification for blocking or rescinding the payment of royalties might vary to some degree depending on whether the royalty has already been paid. In this case we need not define the potential differences, if any, between these two scenarios.

It seems clear that the product was adequately packaged at the time of its sale to EcoClear and presumably exhibited no signs of any inherent defect. At some unspecified point, likely in the summer of 2021, some of the containers expanded and started to leak damaging acid onto the concrete floor of the EcoClear warehouse. This event reflects a defect -- even if inherent -- in the particular batch of SteriCide. At that point, ConSeal had to decide whether to accept the return and credit sought by EcoClear, and plainly was justified in acceding to those requests. Failure to do so exposed the company to potential liability for having sold a defective product, in breach of an implied warranty, and one that caused physical damage to the purchaser's plant. Apart from potential exposure to liability, ConSeal faced the risk that a refusal to comply with an entirely reasonable request by its principal customer, EcoClear, would damage or destroy its long-term relationship with that customer. Given the commercial success that EcoClear had achieved in selling SteriCide to the key large retailers during the peak of the pandemic, such a step would also have severely undercut any hope for a recovery of some part of the market in the future. In short, ConSeal's actions in this respect were commercially entirely reasonable.

Given these conclusions, we further reject claimant's contention that the exploding and leaking SteriCide was surely past its shelf life and should have been written off -- presumably by EcoClear -- or else ignored by ConSeal. The record is somewhat unclear as to whether SteriCide had a one-year shelf life[24], but even assuming that to be the case, the commercial practicalities that we noted -- including the potential risk to both ConSeal and YClean -- presumably compelled ConSeal to act as it did. Given those circumstances, we see nothing in the Me-Too Agreement that precludes a correction of the amount of royalties due to YClean.

There remains a question, not addressed by the parties, whether the appropriate relief is -- as ConSeal assumes -- entry of judgment in the amount of $40,076.00 as a refund of excess royalties paid to claimant or, alternatively, an order deeming that amount to be a debit on the running account of YClean for future royalties.[25] The parties were required to address that

---

[24] Mr. Kielbania so testified (Tr. 500), but this asserted fact was apparently never conveyed to ConSeal. (Tr. 365-66).

[25] The latter approach is a resolution predicated on the assumed continuing operation of the Me-Too Agreement.

question in subsequent briefing, which they have done. <u>See</u> p. 29, <u>infra</u>.

XI. <u>Remaining Relief</u>

Respondent seeks an award of its attorney's fees, other expenses and costs, and pre-judgment interest. As the prevailing party, ConSeal is entitled under the Me-Too Agreement to its expenses of the arbitration, including reasonable attorney's fees. (Ex. R1, para. 10.1. <u>See also</u> JAMS Streamlined Rules 19(e) & (f)). Respondent was authorized to file an application quantifying and documenting those sums, with claimant permitted to file responding papers within one week thereafter. The same schedule applied to the parties' submissions, requested above, that addressed the form of relief to be adopted in conformity with respondent's entitlement under its counterclaims.

As for respondent's request for pre-judgment interest, that would be predicated on the entry of a money judgment for ConSeal, a result that, as of the Partial Final Award, had not yet been determined. In any event, we addressed the question of interest, at least preliminarily. We assumed the applicability of New Jersey law, as the arbitration agreement assigns the venue of the arbitration to Newark, New Jersey (Ex. R1, para. 10.1), and the applicable law on interest is deemed to originate with the forum state. <u>See</u>, <u>e.g.</u>, <u>Gleason v. Norwest Mortgage</u>, 253 Fed. Appx. 198, 203-04, 2007 WL 3326860, *5 (3d Cir. Nov. 9, 2007)(citing <u>N. Bergen Rex Transport, Inc. v. Trailer Leasing Co.</u>, 158 N.J. 561, 730 A.2d 843, 848 (1999)). Under New Jersey law, the decision whether to award interest for a contract claim, as well as the rate for such an award, are discretionary with the court. <u>See</u>, <u>e.g.</u>, <u>County of Essex v. First Union Nat'l Bank</u>, 186 N.J. 46, 61-62, 891 A.2d 600, 609-10 (2006); <u>Amba v. Rupari Food Servs., Inc.</u>, 2016 WL 6471019, *3 (D.N.J. Oct. 16, 2016). In this case, there are several questions that had to be answered in order to finalize a ruling on claimant's request for interest. First, we had to determine whether a monetary award is to be made; if not, there is no basis for charging interest. Second, it was not clear from the record when, if ever, ConSeal made a pre-arbitration demand on YClean for repayment of the excess royalties. Absent such a pre-arbitration demand, we would be disinclined to award interest. Third, in any event, in view of the court's discretion under New Jersey law whether to award interest and, if so, at what rate, the parties were required to brief the question as to how that discretion should be exercised in this case, including, if relevant, the interest rate to be charged and the amount yielded by that rate. In sum, we authorized ConSeal to make a record of any pre-arbitration demand for repayment of the

28

royalties; to address the factual and legal basis, if any, for a discretionary award; and to submit a calculation of proposed interest under New Jersey law. This submission and claimant's responding papers were to be filed in accordance with the previously outlined briefing schedule.

XII. <u>Resolution of Open Issues</u>

A. <u>Counterclaim Relief</u>

As noted, in the Partial Final Award we left for resolution the question whether the sum awarded on respondent's counterclaim should be embodied in a money judgment or deemed a debit on the parties' open account, thus serving as a set-off for future commission obligations of ConSeal. It turns out, however, that by notice dated February 9, 2023 YClean terminated the Me-Too Agreement. (Resp. Post-Hearing Supp. Mem., Ex. 1). Given that development, there is no further account in which to treat the commission debit as a set-off. Accordingly respondent is entitled to an outright award of $40,076.00 on its counterclaim.

B. <u>Pre-Judgment Interest</u>

Respondent has chosen to withdraw its application for an award of pre-judgment interest. (<u>Id.</u>, 2).

C. <u>Attorney's Fees</u>

As the prevailing party, ConSeal is entitled to an award of reasonable attorney's fees under the Me-Too Agreement. (Ex. R1, sec. 10). New Jersey courts apply a presumptive lodestar analysis in calculating the amount of fees, a process that looks to the "number of hours reasonably expended by the successful party's counsel in the litigation, multiplied by a reasonable hourly rate." <u>Litton Indus., Inc. v. IMO Industs., Inc.</u>, 200 N.J. 372, 386, 982 A.2d 420, 428 (2009).[26] In assessing such an application, the courts are to consider an array of factors, including

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

---

[26] The courts in New Jersey apply the same test to contractual attorney-fee applications as is used for other fee applications, such as litigation of statutory fee requests. <u>Id.</u> at 386, 982 A.2d at 428.

(2) the likelihood, if apparent to the client, that the
acceptance of the particular employment will preclude other
employment by the lawyer;

(3) the fee customarily charged in the locality for similar
legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the
circumstances;

(6) the nature and length of the professional relationship
with the client;

(7) the experience, reputation, and ability of the lawyer or
lawyers performing the services;

(8) Whether the fee is fixed or contingent.

Id. at 386-87, 982 A.2d at 428-29.

Respondent seeks an award of $170,772.50 in fees for the
work of four attorneys and a pair of paralegals. That figure
reflects collective billing of 409.7 hours by counsel and 67.8
hours by the paralegals, at rates ranging from $360.00 to $420.00
for Joshua Martin, the most senior attorney, who spent 387.6
hours on the case, to paralegal rates of from $150.00 to
$175.00.[27]

---

[27] The billing reflects the following:

| | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Joshua Martin | 2021 | 21.2 | $360.00 | $7,632.00 |
| | 2022 | 355 | $380.00 | $134,900.00 |
| | 2023 | 31.4 | $420.00 | $13,188.00 |
| James Johnson | 2022 | 1.4 | $380.00 | $532.00 |
| Joshua Cooper | 2022 | 4.6 | $290.00 | $1,334.00 |
| Michael Rutledge | 2022 | 16.1 | $270.00 | $4,347.000 |
| Paralegals | 2021 | 3.9 | $150.00 | $585.00 |
| | 2022 | 19.8 | $150.00 | $2,970.00 |
| | 2022 | 43.3 | $165.00 | $7,144.50 |
| | 2023 | 0.8 | $175.00 | $140.00. |

Respondent reports that the law firm gave the client a
$2,000.00 discount off the totals listed for the paralegals.
(Resp. Post-Hearing Supp. Br., 5-6 & Ex. 3; Martin Decl.,

We first address the rates sought. In assessing the appropriate hourly rates, the court should consider the prevailing local market rates in the community "for similar services by lawyers of reasonably comparable skills, experience and reputation." Id. at 387, 982 A.2d at 429 (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 22 (2004)). Accord Rendine v. Pantzer, 141 N.J. 292, 337, 661 A.2d 1202, 1227 (1995). As a general rule, the relevant community is found in the location of the forum. See, e.g., Interfaith Community Organization v. Honeywell Int'l, Inc., 426 F.3d 694, 704-05 (3d Cir. 2005)(discussing "Report of Third Circuit Task Force on Court Awards", 108 F.R.D. 237, 261 (1985)); Connor v. Sedgwick Claims Mgt. Servs., Inc., 2012 WL 659672, *3 (D.N.J. Dec. 18, 2012); accord Cullens v. Georgia Dep't of Transp., 29 F.3d 1489, 1494 (11th Cir. 1994)(citing Maceira v. Pagan, 698 F.2d 38, 40 (1st Cir. 1983)); Arbor Hill Concerned Citizens County of Albany, 369 F.3d 91, 96 (2d Cir. 2004).[28]

By invoking supportive testimony from a fellow Floridian attorney about billing standards (Decl. Of Matthew S. Nelles, Esq. -- Resp. Post-Hearing Supp. Mem., Ex. 5), respondent appears to assume that the relevant community is in south Florida, but that is plainly not the case. As noted, the arbitration provision of the Me-Too Agreement specified that the arbitration was to take place in Newark (Ex. R1, sec. 10.1), but the parties then filed and litigated their claims in New York, arguably, if implicitly, waiving the requirement of a Newark arbitration.[29] For present purposes, however, we assume that New Jersey is properly deemed the locus of the arbitration, although we see no meaningful distinction between rates found in that state and in Florida.

_____

paras. 5-9 -- Resp. Post-Hearing Supp. Mem., Ex. 4).

[28] An exception will be recognized if the applicant can establish that the forum's community lacked the availability of sufficiently skilled and willing counsel, see, e.g., Interfaith Community Organization 426 F.3d at 704-05, but respondent made no such showing here.

[29] Through the marvels of modern technology, the pre-hearing litigation -- including conferences -- was conducted with the arbitrator located in New York and, we presume, counsel for claimant and respondent located, respectively, in New Jersey and Florida. As for the hearing, respondent's attorney was apparently seated in Massachusetts, with his client's representatives.

In defense of the rates charged, lead counsel for respondent -- who performed almost all of the attorney work on this case and has practiced complex commercial litigation for more than sixteen years -- represents that his rates are discounted by an unspecified amount and that they are lower than the rates regularly charged to clients of his firm. (Martin Decl. paras. 3-4). He also proffers the declaration of a similarly situated practicing Florida commercial litigator who avers that the rates charged by Mr. Martin's firm are in line with rates encountered in similar litigations in south Florida. (Nelles Decl., paras. 17-18).

Based on the representations of Mr. Martin and our research, we conclude that the hourly rates for experienced ligation counsel in complex commercial cases in New Jersey are not inconsistent with the rates for Mr. Martin. See, e.g., Great Western Min. & Mineral Co. v. ADR Options, Inc., 2012 WL 5200068, *3 (D.N.J. Oct. 22, 2012)(citing with approval Holiday v. Cabrera Assocs. P.C., 2007 WL 30291, *4 (E.D. Pa. Jan. 4, 2007)(awarding $400.00 per hour for commercial litigator 16 years ago); Ellis v. Ethicon, Inc., 2010 WL 715403, *3-4 (D.N.J. March 1, 2010)(awarding $350.00 hourly 13 years ago); Wade v. Colaner, 2010 WL 5479625, *4-5 (D.N.J. Dec. 21, 2010)(approving $410.00 for lead attorney 12 years ago). See also Fidelity Life Assoc. v. Cohen, 2017 WL 4220364, *4 (S.D. Fla. Oct. 11, 2017 (approving $525.00). As for the other, more junior, counsel, we see no reason to trim the fees that they have generated in their very brief involvement with this case. Similarly, the charges for the paralegals are reasonable.

As for the number of hours billed by respondent's firm, we note that they are rather substantial when viewed in the light of the issues that formed the basis for resolution of this case. That said, we recognize that the case was heavily litigated, including intensive discovery that encompassed not only document production but six depositions. Moreover, a substantial amount of time was evidently, and justifiably, devoted by respondent to the issue of damages, as claimant was pressing the notion that by use of the so-called Bass model, which was adopted by claimant's two hired economists, claimant might be awarded a substantial seven-figure amount in lost royalties if it prevailed on liability. Given the proof offered at the hearing, it was unnecessary to assess claimant's very ambitious damages case, but respondent was required to spend much time and effort in preparing for and actually rebutting that proffer; thus, it had to arrange a rebuttal case through its own expert and the pursuit of substantial discovery of the underpinnings of claimant's

theories, including depositions of both economists, as well as preparation for and extensive cross-examination of them at the hearing, and devotion of significant post-hearing briefing to that topic.

After a careful review of the detailed time records,[30] as well as the representations of Mr. Martin and the comments of Mr. Nelles,[31] we conclude that the amount of time spent on this case by respondent's attorneys is reasonable and need not be trimmed for excessive billing. Accordingly, we calculate the award of attorney's fees to be the amount sought by respondent, that is, $170,772.50.

D. Respondent's Expert-Witness Fees

Respondent called two expert witnesses to testify at trial -- Marcie D. Bour, an accountant who addressed the question of damages, and Kevin Kutcel, an expert on EPA procedures. Respondent now seeks recovery of the fees paid to each of these witnesses, a request consistent with the provision of the Me-Too Agreement that authorizes the prevailing party to recover reasonable expert-witness fees. (Ex. R1, sec. 10.1). The sums in question are $45,056.00 for Ms. Bour and her company, Florida Business Valuation Group, and $5,989.75 for Mr. Kutcel and KRK Consulting LLC. (Resp. Post-Hearing Supp. Mem., 7-10). We address each request in order.

1. The Damages Expert

Ms. Bour charged an hourly fee of $560.00, although she capped her fee for all work from October through the end of the

---

[30] The invoices contain limited redactions to protect attorney-client communications. Even with those redactions, the submission contains sufficient detail of the tasks performed to permit an appraisal as to the nature of the tasks and the reasonableness of the billing.

[31] Apart from opining on the rates charged by respondent's firm, Mr. Nelles goes on to voice his approval of the amount of time spent on this case by respondent's counsel. (Id., paras. 10-12). Testimony by other attorneys as to the prevailing rates in the community and as to the typical amount of time required to litigate specific types of cases are accepted by New Jersey courts and given some weight. E.g., Seigelstein v. Shrewsbury Motors, Inc., 464 N.J. Super. 393, 407-08, 236 A.3d 1004, 1012-13 (Super. Ct. 2020).

arbitration at $10,000.00, which reflected a significant discount from the hourly rate. (Decl. Of Marcie Bour, para. 5 -- Resp. Post-Hearing Supp. Mem, Ex. 7 (capping fees reduced payments by more than $10,000.00); see id., Ex. 6). There is no question that retention of Ms. Bour to rebut the substantial damages assessments of claimant's two economists was well warranted. She was fully qualified by her training and experience to offer useful testimony addressing the premises of the claimant's damages case, as well as the serious weaknesses of the economists' assessment that, but for respondent's asserted termination of its sales efforts, claimant would have earned millions in royalties the following year.

As for the fees charged, Ms. Bour began her work in August 2022, and undertook tasks that encompassed the review of all pertinent parts of the record, including the substantial report of claimant's experts, preparation of a rebuttal report, preparation for and attendance at the depositions of the two economists, preparation for and attendance at her own deposition, preparation for her hearing testimony, attendance at the hearing for her own testimony, and review of respondent's pre- and post-hearing briefs. We note that her work through August and September encompassed more than 62 billed hours and yet did not include the time later spent at the various depositions, preparation for and attendance at the hearing and the review of respondent's draft submissions.

The hourly rate charged by Ms. Bour is substantial, although the capping of the total fee effectively amounted to a reduction of that hourly figure by more than $100.00. (Id., Bour Decl., paras. 4-5). As for the amount of time devoted to this case, as noted, she billed for more than 62 hours through September and reported spending additional time that was sufficient -- but for the capping of fees -- to generate additional payments of more than $20,000.00, reflecting at least another 35 hours. That said, the sum sought by respondent amounts to payment at the stated rate for approximately 80 hours of work.

On the record before us, we conclude that the hourly rate is reasonable.[32] As for the amount of time apparently devoted to this project, it was quite substantial, but we make some allowance for the fact that Ms. Bour was serving as both a

---

[32] We reject claimant's contention that because Ms. Bour is not an economist, her testimony should be devalued and payment for her services should be either denied or reduced. (Feb. 24, 2023 letter from Philip D. Neuer, Esq.).

34

rebuttal witness and adviser to counsel on an abstruse set of issues (principally, the validity of alternative sets of predictive models of lost future income) that mandated a review of considerable academic literature and analysis of the record of sales volume and earnings for Stericide, and that carried the potential for substantial adverse financial consequences for the client. In addition, Ms. Bour faced the necessity of preparing for three depositions, including undergoing one herself. Further, we note the substantial investment of time and briefing space on both sides devoted to the damages question in post-hearing briefing, reflecting the importance and potential complexity of the underlying issues.

In sum, we award respondent reimbursement of the full amount of the fees paid to Ms. Bour.

### 2. The EPA Expert

The decision to utilize Mr. Kutcel's services was appropriate in view of the issues raised by claimant pertaining to the process of seeking and obtaining registration of both Ygiene and Stericide, as well as the obvious need for context as to the business necessity for the Me-Too Agreement and the administrative challenges imposed by the contract.

Mr. Kutcel's firm charged an hourly fee of $247.00 for his services, which encompassed 24.25 hours of work, starting in July 2022 and ending with the hearing on November 2 and 3, 2022. (Resp. Post-Hearing Supp. Mem., Exs. 9, 10). The overwhelming majority  of Mr. Kutcel's recorded time -- more than 18 hours -- was devoted to the preparation and finalization of his expert report. We view that time as reasonable in light of the nature and substance of the report. We also conclude that the hourly rate for his services was entirely proper. Accordingly, we award respondent reimbursement of the full amount of the fee that it paid for his testimony, which is $5,989.75. (Id., 9-10 & Ex. 10).

### E. The JAMS Fees

Respondent reports having paid $35,937.31 in fees to JAMS, and seeks reimbursement for that amount. That reimbursement request is authorized by the Me-Too Agreement, which states that the prevailing party may recover "[t]he costs and expenses of such arbitration (including the arbitrator's fees and expenses) . . . ." (Ex. R1, para. 10.1).

The amount actually debited by JAMS from the respondent's

account for this case totals $34,394.35,[33] and we award
reimbursement of that sum to respondent. (See Resp. Post-Hearing
Supp. Mem. 10-11; Martin Decl., para. 13).

F. Expenses and Costs

Respondent asserts that it incurred other expenses and costs
totaling $16,539.82 (Id., 11 & Ex. 4, para. 11). This figure is
apparently based on itemizations of "Expenses" and "Advances"
listed in the monthly invoices to the client. (See id., Ex. 3).
We note that the total of all listed "Expenses" and "Advances"
substantially exceeds the figure cited by respondent (see id.,
Ex. 2 (expenses totaled $5,023.13, and advances totaled
$27,516.69), and we infer that claimant is counting only some of
the advances as recoverable under this heading.[34] Although
respondent does not identify which of the items labeled as
advances it is including in its count, the descriptions in the
invoices -- which include as "advances", inter alia, charges for
travel and court-reporter expenses -- suffice to justify the
amount sought.

G. A Final Note

After preparation of the Final Award and its transmission to
JAMS, we were advised that claimant still owes a small amount of
arbitral fees to JAMS and refuses to pay it, thus forestalling
issuance of that Award. Respondent represents that it intends to
pay the sum in question -- amounting to $3,444.35  -- so as to
permit release of the Final Award. (March 28, 2023 email from
Joshua Martin, Esq.; see JAMS Streamlined Arbitration Rules 26(a)
& (c)). Respondent has therefore requested that this sum also be
included as part of the award in its favor, a step authorized by
Rule 26(c). (Id.). Claimant opposes, asserting that it would
"go[] beyond the scope of the Conseal counterclaim" and is
untimely, as the Award "is final." (March 30, 2023 email from
Philip D. Neuer, Esq.).

Respondent's request is granted. As noted, Rule 26(c)
authorizes an award for a party that "has paid more than its

--------

[33] This figure was reported to me today by JAMS. Any surplus
in the account will be refunded to the parties.

[34] The largest single item listed as an advance, for
$10,250.00, is a payment of a JAMS invoice, an expense that is
already counted in a separate category in this Award. (See id.,
Ex. 2 & Ex. 3 (April 2022 invoice)).

share of such fees." Moreover, Rule 19(i) specifies that "after
service of a Final Award by JAMS", a party may request "that the
Arbitrator correct any computational . . . error (including the
reallocation of fees pursuant to Rule 26(c) . . . .)" In this
case there has been no service yet by JAMS of the Final Award,
and plainly the existence of that document in the possession of
JAMS does not preclude its correction to award respondent
reimbursement of the excess fees that it has paid.

Conclusion

For the reasons noted, we conclude that respondent is
entitled to judgment on the claims asserted by YClean. As for
respondent's counterclaims, we conclude that the royalties paid
to YClean on account of sales that were subsequently cancelled --
a total of $40,076.00 -- should be rescinded and respondent
awarded that sum as a judgment. In addition, respondent is
awarded $170,772.50 in attorney's fees, $45,056.00 in expert-
witness fees paid for Ms. Bour's work, $5,989.75 in expert-
witness fees paid for Mr. Kutcel's work, $34,394.35 in arbitral
fees paid to JAMS and $16,539.82 in other expenses and costs
related to this arbitration. Accordingly, we award respondent-
counterclaimant a total of $312,828.42. In addition, with
respondent advancing the sum of $3,444.35 to cover claimant's
shortfall in payment of JAMS fees, respondent will be entitled to
recover that sum in judgment against claimant, increasing the
total award to $316,272.77

Dated: March 30, 2023

Michael H. Dolinger
Arbitrator

37